# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued February 7, 2008         Decided July 11, 2008

No. 05-5173

JAMES OWENS, ET AL.,
APPELLEES

v.

REPUBLIC OF THE SUDAN AND
INTERIOR MINISTRY OF THE REPUBLIC OF THE SUDAN,
APPELLANTS

---

Consolidated with
06-5079

---

Appeals from the United States District Court
for the District of Columbia
(No. 01cv02244)

---

*Knox Bemis* argued the cause and filed the briefs for appellants.

*Steven R. Perles* argued the cause for appellees. With him on the brief were *Thomas Fortune Fay* and *Edward B. MacAllister*.

Before: SENTELLE, *Chief Judge*, and GINSBURG and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SENTELLE.

SENTELLE, *Chief Judge*:  This case arises from the alleged role of the Republic of Sudan and its Interior Ministry ("Sudan") in the simultaneous U.S. embassy bombings in Nairobi, Kenya, and Dar es Salaam, Tanzania, on August 7, 1998, carried out by the terrorist group al Qaeda.  Several of those injured in the bombings and their family members brought suit against Sudan under 28 U.S.C. § 1605(a)(7), alleging that Sudan materially supported the embassy attacks.  This case comes to us on interlocutory appeal from the denial of Sudan's motion to dismiss.  We affirm the district court's holdings that § 1605(a)(7) includes no unconstitutional delegation of Congress's power to define the jurisdiction of the lower federal courts and that the Third Amended Complaint sufficiently alleges causation to meet § 1605(a)(7)'s jurisdictional requirement.  We remand the case to the district court for further proceedings.

## I.  Background

### A.  District Court

Plaintiffs-appellees are United States nationals who were injured in the August 7, 1998 bombings of the U.S. embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania, and family members of those injured in the attacks perpetrated by al Qaeda. Appellees claim Sudan materially supported the attacks by sheltering and protecting al Qaeda "from interference while carrying out planning and training of various persons for terrorist attacks, including the attacks of August 7, 1998." Third Amended Complaint ("Compl.") ¶ 8.  Appellees assert that

United States courts have jurisdiction over Sudan, a foreign sovereign, and its Interior Ministry under the state sponsor of terrorism exception, 28 U.S.C. § 1605(a)(7), to the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602–11.

On March 10, 2004, Sudan moved to dismiss appellees' Second Amended Complaint for lack of subject matter jurisdiction, failure to state a claim upon which relief can be granted, the Act of State Doctrine, and the Political Question Doctrine. Sudan also argued that 28 U.S.C. § 1605(a)(7) is an unconstitutional delegation of power to the Executive Branch because it allows the Secretary of State to determine the jurisdiction of the federal courts.

On March 29, 2005, the district court denied Sudan's motion to dismiss but also ordered appellees to file an amended complaint that would state with more specificity the "material support" Sudan provided to the perpetrators of the embassy bombings and would allege that a Sudanese official provided this material support while "acting within the scope of his office, employment, or agency." *Owens v. Republic of Sudan*, 374 F. Supp. 2d 1, 15, 17 (D.D.C. 2005) (internal quotation marks omitted). Sudan appealed this decision, but we held the appeal in abeyance pending possible further action by the district court.

On May 3, 2005, appellees filed a Third Amended Complaint in response to the district court's March 29th decision. This complaint stated with significantly more specificity the allegations of material support on the part of Sudan. Sudan again moved to dismiss for lack of subject matter jurisdiction and failure to state a claim. On January 26, 2006, the district court denied Sudan's motion. *Owens v. Republic of Sudan*, 412 F. Supp. 2d 99 (D.D.C. 2006). Sudan appealed this decision.

In this appeal, we address issues in the consolidated appeals from the district court's March 29, 2005 and January 26, 2006 orders. Sudan asks us to reverse the district court's denial of its motion to dismiss for two reasons. First, Sudan argues that 28 U.S.C. § 1605(a)(7) includes an unconstitutional delegation of Congress's power to define the jurisdiction of the lower federal courts. Second, Sudan argues that appellees' Third Amended Complaint fails to allege sufficient facts to meet the jurisdictional causation requirement of § 1605(a)(7).

## B.  § 1605A's Enactment

While this consolidated appeal from the March 29, 2005 and January 26, 2006 orders was pending in this Court, Congress amended the state sponsor of terrorism exception. On January 28, 2008, the President signed the National Defense Authorization Act for Fiscal Year 2008 ("NDAA"), Pub. L. No. 110-181, 122 Stat. 3.  Section 1083 of the NDAA strikes 28 U.S.C. § 1605(a)(7) from the U.S. Code and replaces it with a new "[t]errorism exception to the jurisdictional immunity of a foreign state."  122 Stat. at 338–44 (codified at 28 U.S.C. § 1605A).  This statutory change raised questions about the application of § 1605A to pending cases such as this one and whether § 1605(a)(7) continues to apply to them.  We settled this issue in *Simon v. Republic of Iraq*, No. 06-7175, slip op. (D.C. Cir. June 24, 2008), in which we held that we "retained jurisdiction over cases pending pursuant to former § 1605(a)(7) when the Congress enacted the NDAA."  *Id.* at 7.

For the reasons expressed in *Simon*, and absent any further action by the district court since § 1605A's enactment, § 1605(a)(7) continues to apply to this case.  Therefore, the two issues raised by Sudan remain relevant despite the recent changes to the state sponsor of terrorism exception.  We resolve these issues in the discussion that follows and remand this case

to the district court for further proceedings.

## II.  Analysis

United States Courts of Appeal do not ordinarily have jurisdiction over interlocutory appeals, that is, appeals from orders that do not conclusively end the litigation, 28 U.S.C. § 1291, such as the denial of a motion to dismiss.  But when such a denial subjects a foreign sovereign to jurisdiction, the order is "subject to interlocutory appeal under the collateral order doctrine."  *El-Hadad v. United Arab Emirates*, 216 F.3d 29, 31 (D.C. Cir. 2000); *see Simon*, slip op. at 7 (holding that the NDAA § 1083(a)(f) (enacted January 28, 2008), which prohibits the taking of appeals "not conclusively ending the litigation" unless "taken pursuant to section 1292(b) of [Title 28]," does not apply to § 1605(a)(7) cases pending on appeal when the statute was enacted and continuing under § 1605(a)(7)).  We review the district court's denial of Sudan's motion to dismiss for lack of subject matter jurisdiction *de novo*.  *See Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1028 (D.C. Cir. 1997).

## A.  Delegation Challenge

Sudan asserts that the courts of the United States lack jurisdiction because Sudan, as a foreign state, enjoys foreign sovereign immunity from suits in those courts.  The fundamental principle upon which this argument rests is the unarguable proposition that federal courts are courts of limited jurisdiction. Unlike the Supreme Court, which has some limited elements of jurisdiction afforded by the Constitution, the inferior courts of the United States, such as this court and the district court from which this appeal lies, are creatures of statute and possess no jurisdiction except as afforded by congressional enactment. *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552

(2005); *Belhas v. Ya'alon*, 515 F.3d 1279, 1282–83 (D.C. Cir. 2008). Congress adopted the doctrine of foreign sovereign immunity in 28 U.S.C. § 1604, which provides that subject to exceptions not here relevant, "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607." Therefore, unless the present action falls within one of the exceptions created by the sections incorporated in § 1604, the district court had no jurisdiction over the instant action and should have dismissed the case. We must therefore look to those statutes to determine if jurisdiction lies over appellees' claims.

Appellees argue, and the district court concluded, that the court had jurisdiction under 28 U.S.C. § 1605(a)(7), which provides that:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency . . . .

However, this exception to foreign sovereign immunity applies only where the foreign state has been "designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. § 2405(j)) or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371) at the time the act occurred." 28 U.S.C. § 1605(a)(7)(A) (Supp. V. 2005). The Export Administration Act of 1979 ("EAA") and the Foreign Assistance Act of 1961 ("FAA") assign to the Secretary of State the power to determine

whether the government of a country "has repeatedly provided support for acts of international terrorism." 50 U.S.C. App. § 2405(j)(1)(A); 22 U.S.C. § 2371(a) (identical language). Therefore, the jurisdiction of the court under this statute is dependent upon the designation of the foreign state (in this case, Sudan) as a state sponsor of terrorism by the Secretary. It is undisputed that on August 12, 1993, Secretary of State Warren Christopher exercised his authority under the EAA and designated Sudan a state sponsor of terrorism:

> In accordance with section 6(j) of the [EAA], I hereby determine that Sudan is a country which has repeatedly provided support for acts of international terrorism. The list of 6(j) countries as of this time therefore includes Cuba, Iran, Iraq, Libya, North Korea, Sudan and Syria.

Determination Sudan, 58 Fed. Reg. 52,523 (Oct. 8, 1993).

Sudan argues that the EAA and the FAA, by empowering the Secretary of State, an official of the Executive Branch, to determine which countries are subject to the state sponsor of terrorism exception to the general rule of sovereign immunity codified in the FSIA, constitute an unconstitutional statutory delegation of congressional authority to the Executive in violation of the separation of powers embodied in the Constitution.

In order to determine whether this statute violates the separation of powers inherent in the structure of the Constitution, we must first look at the relevant constitutional provisions. The Constitution assigns to Congress the power to define the jurisdiction of the lower federal courts. This power derives from Congress's power in Article I "[t]o constitute tribunals inferior to the Supreme Court," U.S. CONST. art. I, § 8, and in Article III to "ordain and establish" inferior courts, U.S.

CONST. art. III, § 1. *See Kline v. Burke Constr. Co.*, 260 U.S. 226, 233–34 (1922) (holding that lower federal courts derive their "jurisdiction wholly from the authority of Congress . . . provided it be not extended beyond the boundaries fixed by the Constitution"); *Fair Assessment in Real Estate Ass'n v. McNary*, 454 U.S. 100, 125 (1981) (Brennan, J., concurring in the judgment); *Belhas*, 515 F.3d at 1282–83. Congress may exercise its power to define the lower courts' jurisdiction through its legislative authority. U.S. CONST. art. I, § 8 ("The Congress shall have power . . . [t]o make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States . . . ."). Sudan's argument depends upon the proposition that the authority constitutionally apportioned to Congress to define the jurisdiction of the federal courts has been unconstitutionally delegated to the Executive by the statutory device allowing a department of the Executive Branch to make findings upon which the effectiveness of the jurisdictional grant partially depends.

We note at the outset that the delegation by Congress to the Executive is not nearly so broad as Sudan's styling of it might suggest. In the state sponsor of terrorism exception, Congress did not empower the Executive to create a statute-like definition or delineation of an area of jurisdiction within which the Article III courts might exercise judicial authority over otherwise immune foreign sovereign states. Rather, Congress delineated the area of immunity and the exception to the immunity, delegating to the Executive only the authority to make a factual finding upon which the legislatively enacted statute and the judicially exercised jurisdiction would partially turn.

While most cases considering the constitutional limits to congressional delegation of power to the Executive have not dealt with the interaction of the delegation doctrine and the

congressional authority to define jurisdiction of the courts, the present controversy is not without parallel.  In general terms, there is no question that Congress has some constitutional power to make delegations of authority to the Executive or agencies of the federal government.  True, Article I, Section 1 of the Constitution vests "all legislative power herein granted" to the "Congress of the United States."  While that text does not permit the delegation of legislative power, the Supreme Court has repeatedly taught that Congress can confer "decisionmaking authority upon agencies," but that to do so constitutionally, "*Congress* must 'lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform.'"  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (emphasis and brackets in original) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).

The "intelligible principle" standard of review for delegation challenges "has been driven by a practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta v. United States*, 488 U.S. 361, 372 (1989).  Thus, Article I's vesting of legislative powers in Congress "do[es] not prevent Congress from obtaining the assistance of its coordinate Branches." *Id.*  The intelligible principle that limits the Executive Branch's authority pursuant to a delegation can be open to many interpretations yet pass constitutional muster.  For example, the Supreme Court in *Lichter v. United States*, 334 U.S. 742 (1948), upheld a delegation to Executive officials to determine "excessive profits" in government contracts during wartime because the term was defined by "the purpose of the Renegotiation Act and its factual background." *Id.* at 785.  And in *National Broadcasting Co. v. United States*, 319 U.S. 190 (1943), the

Court upheld a delegation to the Federal Communications Commission ("FCC") to regulate broadcast licensing "as public interest, convenience, or necessity requires" because the "'purpose of the Act, the requirements it imposes, and the context of the provision'" cabin the agency's discretion. *Id.* at 225–26 (quoting *N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12, 24 (1932)). So when we review statutes for an intelligible principle that limits the authority delegated to a branch outside the legislature, we do not confine ourselves to the isolated phrase in question, but utilize all the tools of statutory construction, including the statutory context and, when appropriate, the factual background of the statute to determine whether the statute provides the bounded discretion that the Constitution requires.

Sudan asks this Court to apply a stricter standard to this delegation than to delegation challenges we have considered in the past because this delegation involves powers given to Congress in Article III of the Constitution. *See* U.S. CONST. art. III, § 1 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."). Sudan proposes that Congress's Article III power to define lower federal courts' jurisdiction is more "core" than its Article I powers, thus requiring a delegation standard more exacting than what would otherwise be permitted by the Supreme Court's precedent, or perhaps permitting no delegation at all. For support, Sudan cites cases from two of our sister circuits, neither of which holds that a stricter standard applies to Article III delegation, but both do use language suggesting one might.

Sudan first cites *Miller v. FCC*, 66 F.3d 1140 (11th Cir. 1995), in which the Eleventh Circuit stated in dicta that "it is axiomatic that Congress has not delegated, and could not delegate, the power to any agency to oust state courts and

federal district courts of subject matter jurisdiction." *Id.* at 1144 (declining to review a FCC advisory opinion on the preemptive force of one of its enabling statutes because there was no pending case or controversy). The *Miller* court cites no authority for this proposition and includes no analysis of the issue. We do not read this excerpted phrase to exclude all forms of delegation of Congress's jurisdiction-conferring power. Specifically, it does not speak to the issue at hand, which is whether Congress may delegate the authority to the Executive Branch to make a finding of fact upon which subject matter jurisdiction depends, as opposed to the authority to define those conditions in the first place.

Sudan next cites a Seventh Circuit opinion that addressed the standard for delegating Congress's Article III powers over the courts more directly, though still in dicta. *See United States v. Mitchell*, 18 F.3d 1355 (7th Cir. 1994). Admitting that "such a theory has found little promotion since" *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935), and *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), the only cases in our nation's history in which the Supreme Court struck down a statute on nondelegation grounds, the court pondered whether "anything in the Framers' language would permit Congress to delegate such a core legislative function as its control over federal court jurisdiction to any agency or commission." *Mitchell*, 18 F.3d at 1360 n.7. The court further noted that Congress's "ability to delegate a power as sensitive and central to our Anglo-American legal tradition as shaping a federal court's jurisdiction," *id.*, is readily distinguishable from cases such as *Yakus v. United States*, 321 U.S. 414 (1944), which permitted Congress to delegate the authority to fix commodity and rent prices during wartime to an executive commission. Despite language suggesting its support for appellants' argument, the Seventh Circuit never decided the Article III delegation issue. Furthermore, like the Eleventh

Circuit in *Miller*, the Seventh Circuit did not consider the difference between delegating to the Executive the authority to define the conditions under which the courts will have jurisdiction and delegating the authority to make factual findings that satisfy those conditions. In any event, we are not persuaded by its dicta for the reasons we discuss below.

A statute that delegates factfinding decisions to the President which rely on his foreign relations powers is less susceptible to attack on nondelegation grounds than one delegating a power over which the President has less or no inherent Constitutional authority. As the Supreme Court explained in *Zemel v. Rusk*, 381 U.S. 1 (1965),

> [i]t is important to bear in mind, in appraising this [delegation] argument, that because of the changeable and explosive nature of contemporary international relations, and the fact that the Executive is immediately privy to information which cannot be swiftly presented to, evaluated by, and acted upon by the legislature, Congress—in giving the Executive authority over matters of foreign affairs—must of necessity paint with a brush broader than that it customarily wields in domestic areas.

*Id.* at 17. And as the Court noted in *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936), "requiring Congress in this field of governmental power to lay down narrowly definite standards by which the President is to be governed" may be unwise because in matters involving foreign relations the President must sometimes rely on confidential information and must also consider "the effect which his action may have upon our foreign relations." *Id.* at 321–22. The Court again applied this reasoning in *Knauff v. Shaughnessy*, 338 U.S. 537 (1950): "Normally Congress supplies the conditions of the privilege of

entry into the United States. But because the power of exclusion of aliens is also inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power . . . ." *Id.* at 543.

We also note that the particular delegation Sudan is challenging is narrower than Sudan suggests. *See Whitman*, 531 U.S. at 475 ("[T]he degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred."). Congress did not, as Sudan argues, delegate its power to define federal jurisdiction to the Executive Branch; instead, it simply assigned to the President the authority to make a factfinding upon which jurisdiction partially rests. The Supreme Court has consistently upheld delegations, such as the one here, that predicate the operation of a statute upon some Executive Branch factfinding. *See, e.g.*, *United States v. Grimaud*, 220 U.S. 506 (1911) (upholding a statute delegating to the Secretary of Agriculture the duty to issue rules and regulations for a forest reservation, which the statute then designated as criminal offenses). The Supreme Court affirmed this principle as early as 1892. The Court in *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892), analyzed whether legislation is valid if "it makes the suspension of certain provisions and the going into operation of other provisions of an act of congress depend upon the action of the president based upon the occurrence of subsequent events, or the ascertainment by him of certain facts, to be made known by his proclamation." *Id.* at 683. Noting that the President in that case "was the mere agent of the law-making department to ascertain and declare the event upon which [Congress's] expressed will was to take effect," *id.* at 693, the Court held that "'[t]he legislature cannot delegate its power to make a law, but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend.'" *Id.* at 694 (quoting *Locke's Appeal*, 72 Pa. 491, 1873

14

WL 11863, at \*6 (1873)).

The Supreme Court has also upheld statutes that predicate the courts' subject matter jurisdiction upon an Executive Branch factfinding. The statute at issue in *Jones v. United States*, 137 U.S. 202 (1890), extended admiralty jurisdiction over land the President determined "appertain[ed]" to the United States when certain other preconditions were met—namely, that the island contained guano and was not within the lawful jurisdiction of another government. *Id.* at 209. The President's decision to recognize the "guano island" involved in *Jones* directly impacted the courts' admiralty jurisdiction. *Id.* at 211. In response to arguments challenging the constitutionality of the jurisdiction-conferring statute, the Supreme Court held that it "unequivocally extends the provisions of the statutes of the United States for the punishment of offenses committed upon the high seas to like offenses committed upon guano islands which have been determined by the president to appertain to the United States." *Id.* The Supreme Court again in *Curtiss-Wright* upheld a joint resolution that predicated the operation of—and therefore the ability of the courts to enforce—a criminal statute on a presidential factfinding in an area in which he has inherent constitutional authority. 299 U.S. at 312, 329 (confirming that the President had the authority to proclaim that the prohibition of the sale of arms to countries engaged in armed conflict in the Chaco "'may contribute to the reestablishment of peace'" in the region (quoting Joint Resolution, ch. 365, 48 Stat. 811)).

Section 1605(a)(7), like the statutes at issue in *Jones* and *Curtiss-Wright*, predicates its operation on an Executive factfinding in an area in which he has considerable constitutional authority—foreign affairs. And unlike the prior cases, the particular factfinding delegated to the Executive Branch by § 1605(a)(7) is just one of many preliminary conditions upon which this Court's jurisdiction is based. In

order to exercise jurisdiction, we must also ensure that the plaintiffs seek money damages for personal injury or death, that the injury was caused by "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act," that the act was perpetrated by an official, employee, or agent of the foreign (terrorist) state "while acting within the scope of his or her office, employment, or agency," that the foreign state had a chance to arbitrate the claim "if the act occurred in the foreign state[,]" and that the claimant or victim was a United States national when the act occurred. 28 U.S.C. § 1605(a)(7). Thus it is well within the Supreme Court's precedent to hold that the delegation of the particular factfinding authority in § 1605(a)(7) does not violate the separation of powers inherent in the Constitution.

Finally, we note that § 1605(a)(7) is not the only component of the FSIA that predicates our jurisdiction, in part, upon an Executive factfinding. The FSIA in its entirety depends upon the President's decision to recognize an entity as a foreign nation because the FSIA only applies to recognized nations. Sudan does not dispute this delegation of factfinding authority, presumably because it is settled that the decision to recognize a foreign state "is exclusively a function of the Executive." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 410 (1964). The President's power to recognize foreign sovereignties not only impacts our jurisdiction under the FSIA; it also directly impacts the alienage jurisdiction of the federal courts, which requires that a civil action be between "citizens of a State and citizens or subjects of a foreign state." 28 U.S.C. § 1332(a)(2); *see, e.g.*, *Bank of Hawaii v. Balos*, 701 F. Supp. 744, 747 (D. Haw. 1988) (holding that the Republic of the Marshall Islands is a foreign state for the purpose of alienage jurisdiction, relying on the fact that "both the Congress and the President have indicated that the RMI is henceforth to be treated as an independent sovereign.").

A delegation to the Executive Branch to determine whether a foreign sovereign "has repeatedly provided support for acts of international terrorism," 50 U.S.C. App. § 2405(j)(1)(A), is certainly a narrower conference of authority than one that permits the President to determine whether an entity is a recognized nation at all.

Bearing in mind that the shared responsibilities of the Legislative and Executive Branches in foreign relations may permit a wider range of delegations than in other areas, and the long-established precedent supporting the constitutionality of statutes that predicate the operation of a statute on an Executive Branch factfinding, we analyze § 1605(a)(7) under our well-established "intelligible principle" standard. When looking for principles that guide the delegation, we look first to the text of the statute, as well as to other ordinary tools of statutory construction. *See Lichter*, 334 U.S. at 785. Because the Secretary of State designated Sudan a state sponsor of terrorism pursuant to his authority under the EAA, we look to limits and standards in that statute which provide parameters to guide the Secretary of State's authority.

The EAA permits the Secretary of State to label a country a state sponsor of terrorism if the "government of such country has repeatedly provided support for acts of international terrorism." 50 U.S.C. App. § 2405(j)(1)(A). Sudan argues that this delegation is not specific enough—that it does not define "repeatedly," "support," or "acts of international terrorism," or require Congress's approval. In light of the Supreme Court's precedent, it is clear that no further definition of these terms is required; they are sufficiently intelligible as they are. *See Whitman*, 531 U.S. at 475 ("[W]e did not require the statute to decree how 'imminent' was too imminent, or how 'necessary' was necessary enough, or even . . . how 'hazardous' was too hazardous."). In any event, a related statute requiring the

Secretary of State to prepare a detailed assessment of state sponsors of terrorism defines, *inter alia*, the terms "terrorism" and "international terrorism." 22 U.S.C. § 2656f(d)(1), (2). The statutory context surrounding § 1605(a)(7) coupled with the Executive Branch's inherent constitutional authority in the area of foreign affairs provide more than enough guidance to the Secretary of State to make a finding of fact upon which the operation of § 1605(a)(7) partially depends. We hold that § 1605(a)(7) does not include an unconstitutional delegation of authority to the Executive Branch.

## B. Sufficiency of the Pleadings

Sudan argues that appellees failed to plead the jurisdictional causation requirement; specifically, it argues appellees failed to plead sufficient facts to "reasonably support a finding" that Sudan's material support of al Qaeda in the early 1990s caused the embassy bombings in Kenya and Tanzania in 1998. *See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 94 (D.C. Cir. 2002) (holding that plaintiffs' allegations of abuse did not amount to the allegations of torture required by § 1605(a)(7) to survive a motion to dismiss). Because "causation is indeed a jurisdictional requirement" in the context of § 1605(a)(7), and we would unnecessarily subject Sudan to "the attendant burdens of litigation" if we were to errantly conclude at the start that it is sufficiently pled, we have authority to review this challenge in this interlocutory appeal. *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126–27 (D.C. Cir. 2004) (internal quotation marks omitted).

In order for § 1605(a)(7) to confer jurisdiction over a foreign state sponsor of terrorism, a plaintiff must plead, *inter alia*, that (1) "while acting within the scope of his or her office, employment, or agency," (2) "an official, employee, or agent" of the foreign state (3) either (i) committed "an act of torture,

extrajudicial killing, aircraft sabotage, [or] hostage taking," or (ii) "provi[ded] . . . material support or resources . . . for such an act," (4) which "caused" the plaintiff "personal injury or death." 28 U.S.C. § 1605(a)(7). This section "requires, as a matter of jurisdiction, a causal connection between the foreign state's alleged acts and the victim's alleged injuries." *Kilburn*, 376 F.3d at 1127. Citing *Kilburn*'s discussion of § 1605(a)(7)'s causation requirement, appellees contend they must plead "proximate" causation but not "but-for" causation. Sudan responds that *Kilburn* "does not eliminate" the but-for requirement because that requirement "is one element of proximate cause." We need not decide whether § 1605(a)(7) requires but-for causation because, as discussed below, appellees have alleged facts sufficient to satisfy a but-for requirement.

Before we consider appellees' allegations, however, we must address Sudan's contention that heightened specificity is required of appellees' pleading because causation is a jurisdictional requirement. But the FSIA directs that "[a]s to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter, the foreign state *shall be liable in the same manner and to the same extent as a private individual* under like circumstances . . . ." 28 U.S.C. § 1606 (emphasis added). Federal Rule of Civil Procedure 8(a), the rule governing the sufficiency of appellees' Third Amended Complaint, requires only "a short and plain statement of the grounds for the court's jurisdiction . . . ; [and] a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." A private individual served with a pleading that is subject to Rule 8(a) would not receive the benefit of a heightened pleading requirement unless a Rule or statute so ordains. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002). Sudan points to no Rule or statute that imposes a heightened pleading requirement in the context of the terrorism

exception. *Cf.* FED. R. CIV. P. 9(b) (imposing heightened pleading standards for certain types of claims and defenses). Instead, Sudan tries to limit the principle expressed in *Swierkiewicz* to merits pleadings. That argument is inconsistent with Rule 8, which, as just noted, expressly applies its 'a short and plain statement' requirement to jurisdictional pleadings. *See* FED. R. CIV. P. 8(a)(1). Indeed, we have held the standard for assessing the sufficiency of jurisdictional pleadings under the FSIA "is similar to that of Rule 12(b)(6)." *Price*, 294 F.3d at 93 (citations omitted). Thus no heightened pleading requirement applies here. "Pleadings must be construed so as to do justice." FED. R. CIV. P. 8(e). We only require that the complaint contain "enough factual matter (taken as true)" to suggest that Sudan's material support of al Qaeda was a cause of the embassy bombings. *See Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007). In other words, we require "enough fact to raise a reasonable expectation that discovery will reveal evidence" of this causal link. *Id.*; *see also Stokes v. Cross*, 327 F.3d 1210, 1215 (D.C. Cir. 2003).

Sudan argues that the Third Amended Complaint fails to allege enough facts "to raise a reasonable expectation that discovery will reveal evidence of" causation. *Twombly*, 127 S. Ct. at 1965. Specifically, it states that the complaint lacks specific dates other than Sudan's invitation to al Qaeda in the early 1990s to relocate to Sudan, lacks allegations that Sudan's aid of al Qaeda's weapons movement and explosives training was connected to the embassy bombings, and lacks allegations that al Qaeda would not have had sufficient finances to carry out the attacks if not for Sudan's help.

In support of their claim that Sudan's "material support" of al Qaeda was a cause of the embassy bombings, appellees allege that Sudan "entered into an arrangement with al Qaeda and Hezbollah under which those organizations received shelter and

protection from interference while carrying out planning and training of various persons for terrorist attacks, including the attacks of August 7, 1998." Compl. ¶ 8. They support this comparatively general allegation with numerous facts about Sudan's provision of protection for al Qaeda's leadership and agents, its aid in al Qaeda's weapons movement, its provision of financial resources to the terrorist group, and even its work to ensure the secrecy of al Qaeda's training camps and agents. *Id.* Appellees claim that "[w]ithout [this] material support, . . . Al Qaeda could not have carried out the United States embassy bombings that caused plaintiffs' injuries." *Id.* Although "Plaintiffs' allegations are somewhat imprecise as to the temporal proximity of Sudan's actions to and their causal connection with the" terrorist act and "do not chart a direct and unbroken factual line between Sudan's actions" and the terrorist act, this "imprecision is not fatal for purposes of jurisdictional causation so long as the allegations, and the reasonable inferences drawn therefrom, demonstrate a reasonable connection" between the foreign state's actions and the terrorist act. *Rux v. Republic of Sudan*, 461 F.3d 461, 474 (4th Cir. 2006). "A claimant need not set out all of the precise facts on which the claim is based in order to survive a motion to dismiss." *Price*, 294 F.3d at 93. Appellees' factual allegations and the reasonable inferences that can be drawn therefrom show a reasonable enough connection between Sudan's interactions with al Qaeda in the early and mid-1990s and the group's attack on the embassies in 1998 to meet § 1605(a)(7)'s jurisdictional causation requirement.

## III. Conclusion

Because we find that § 1605(a)(7) includes no unconstitutional delegation of Congress's power to define the jurisdiction of the lower federal courts and appellees' Third Amended Complaint sufficiently alleges the jurisdictional

causation requirement, we affirm the district court's denial of Sudan's motion to dismiss.  We remand this case to the district court for further proceedings.